**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 15-cr-353-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.    **KATHERINE O'NEAL**,

    Defendant.

## ORDER REQUIRING FURTHER BRIEFING

This matter is before the Court on Defendant's Motion to Suppress Statements. (ECF No. 39.) The parties have unknowingly stumbled into a legal thicket regarding the standard for judging whether statements made to foreign officers are admissible. The Court requires further briefing on this topic.[1]

"The cases are unanimous in holding that a [*Miranda*] warning is not essential to the validity of a confession which has been given in a foreign country." *United States v. Mundt*, 508 F.2d 904, 906 (10th Cir. 1974). The parties agree, however, that statements may nonetheless be ruled inadmissible in certain circumstances, particularly, (1) when the United States officials substantially participate in the relevant questioning, or when foreign officers are effectively the agents of the United States

---

[1] The matters on which the Court requires briefing have significance well beyond this case. Thus, although the Court will not order it, the Government in particular is encouraged to seek the input and/or assistance of "Main Justice" in formulating its responses to the Court's questions. The Court is also willing to entertain the possibility of *amicus* briefs (presumably although not necessarily from parties supporting the Defendant) so long as they offer practical rather than theoretical solutions.

while questioning the defendant; or (2) the judicial conscience is shocked by circumstances in which the defendant makes statements to foreign officials.  (*See* ECF No. 39 at 5–9; ECF No. 41 at 9–21.)  As explained below, the Court desires additional clarity on both of these circumstances.

1.

It seems intuitively sound that United States participation in a foreign interrogation, either directly or through foreign officers acting as United States agents, would implicate the United States's duties under the Fifth Amendment.  And in *Mundt, supra*, the Tenth Circuit seemingly endorsed this view when it asked "whether the participation by the American authorities [in a Peruvian interrogation] was so extensive as to require that the [defendant's] statements be excluded."  508 F.2d at 906.

*Mundt* appears simply to assume that the Fifth Amendment applies to American officials acting abroad, but the Supreme Court has never been able to agree on this principle, even when the subject of the questioning was an American citizen (as Defendant is).  In *Reid v. Covert*, 354 U.S. 1 (1957), a plurality stated that "[w]hen the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land."  *Id*. at 6 (plurality opn. of Black, J.).  However, as elucidated in later Supreme Court opinions, the justices in the plurality opinion and the other justices who concurred in the judgment split precisely on this point of whether constitutional protections applied abroad on account of citizenship or on consideration of the practical exigencies of applying such

protections abroad. *See Boumediene v. Bush*, 553 U.S. 723, 759–62 (2008); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269–70 (1990).

The Court therefore requires further briefing on the following questions:

- Assuming the United States sufficiently participates (directly or constructively) in a foreign interrogation, what is the source of the United States's obligation, if any, to afford the witness protection against self-incrimination?

- If the United States has such an obligation, is it discharged by giving a proper *Miranda* warning?[2]

- Assuming there is an obligation to give a proper *Miranda* warning, is that obligation discharged by a foreign official giving such a warning, or a similar warning under local law that is materially equivalent to a *Miranda* warning?

**2.**

Although the parties appear to agree that statements obtained by foreign officials in conscience-shocking circumstances are inadmissible, the Court has significant reservations that such a standard exists in lieu of a traditional voluntariness inquiry (discussed below). But there is also a serious question whether *any* standard can apply and still be consistent with Supreme Court pronouncements about the reach of the due process clause.

**A.** The parties have not cited, nor could the Court locate, a Supreme Court or

---

[2] *Cf. United States v. Bin Laden*, 132 F. Supp. 2d 168, 185–89 (S.D.N.Y. 2001), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177 (2d Cir. 2008).

Tenth Circuit decision announcing a "shocks the conscience" standard in the context of statements made to foreign officials. To be sure, *United States v. Delaplane*, 778 F.2d 570 (10th Cir. 1985), states that the *Fourth Amendment* exclusionary rule does not apply to foreign *searches and seizures* except "(1) where foreign police conduct shocks the judicial conscience," or "(2) where American agents participated in the foreign search, or the foreign officers acted as agents for their American counterparts." *Id*. at 573 (internal quotation marks and citations omitted; alterations incorporated). But whatever the basis for these exceptions regarding foreign searches and seizures,[3] it is not clear why a "shocks the conscience" standard should apply to foreign interrogation, as opposed to a traditional voluntariness inquiry.

Defendant and the Government cite numerous extra-circuit authorities—mostly from the Second, Fifth, and Eleventh circuits—that contain some variant of a "shocks the conscience" test for foreign interrogations. *See, e.g.*, *United States v. Frank*, 599 F.3d 1221, 1228–29 (11th Cir. 2010); *United States v. Yousef*, 327 F.3d 56, 146 (2d Cir. 2003); *United States v. Heller*, 625 F.2d 594 (5th Cir. 1980). But, as pointed out in *United States v. Karake*, 443 F. Supp. 2d 8 (D.D.C. 2006), these decisions ultimately trace back to cases that unthinkingly apply the foreign search-and-seizure test to the foreign interrogation standard, or that simply do not announce any true "shocks the conscience" test. *Id*. at 52 n.74.

---

[3] There is room for debate here (or at least clarification), given the Supreme Court's later holding that the Fourth Amendment does not apply "to the search and seizure by United States agents of property that is owned by a nonresident alien and located in a foreign country." *Verdugo-Urquidez*, 494 U.S. at 261; *see also* 2 Wayne R. LaFave et al., *Criminal Procedure* § 3.1(i) (4th ed., Dec. 2016 update) ("*Criminal Procedure*").

**B.** As noted, *Miranda* warnings are generally not (and conceivably never) necessary in foreign interrogations. However, even if a suspect in a domestic interrogation validly waives his or her *Miranda* rights (or is not facing a "custodial interrogation" within the meaning of *Miranda*), any statements extracted from that suspect must still have been made "voluntarily." *See, e.g.*, *Beckwith v. United States*, 425 U.S. 341, 348 (1976) (statements resulting from noncustodial questioning can still be challenged on voluntariness grounds); *Lego v. Twomey*, 404 U.S. 477, 487–88 (1972) (treating the voluntariness of a confession as a separate issue from *Miranda* warnings).

A significant early Supreme Court case regarding voluntariness grounded this rule in the Fifth Amendment protection against self-incrimination. *See Bram v. United States*, 168 U.S. 532, 542 (1897). Relying on the Fifth Amendment was natural under the circumstances given that the appeal came from a federal prosecution—a charge of murder on the high seas aboard an American vessel. *Id*. at 534. The defendant, however, had been strip-searched and apparently left naked in the course of his interrogation by a detective, and the fruits of this interrogation were used against him at trial to prove his guilt. *Id*. at 538, 563. In this light, and applying a voluntariness standard said to derive from the Fifth Amendment, the Supreme Court eventually concluded that the defendant's statements had not been voluntary, and therefore their admission at trial was an error requiring a new trial. *Id*. at 561–65.

*Bram* becomes more important below (Part 2.E), because, as it turns out, the interrogation was performed by a Canadian detective in Canada—a matter the

Supreme Court apparently found of no significance. For present purposes it is enough to note that, although the Supreme Court continued to develop the voluntariness doctrine in the decades after *Bram*, it did so largely by relocating it to the Fourteenth Amendment's due process clause. *See, e.g.*, *Culombe v. Connecticut*, 367 U.S. 568, 590–91 (1961); *Brown v. Mississippi*, 297 U.S. 278, 285 (1936). This was because the Court had never declared the Fifth Amendment privilege against self-incrimination applicable to the states, and in fact had held the opposite in *Twining v. New Jersey*, 211 U.S. 78, 114 (1908) ("the exemption from compulsory self-incrimination in the courts of the states is not secured by any part of the Federal Constitution").

That changed in *Malloy v. Hogan*, 378 U.S. 1 (1964). In *Malloy*, the Supreme Court frankly acknowledged that its Fourteenth Amendment voluntariness jurisprudence was "impelled" by *Twining*, but any distinction between voluntariness grounded in the privilege against self-incrimination and voluntariness grounded in due process "was soon abandoned, and today the admissibility of a confession in a state criminal prosecution is tested by the same standard applied in federal prosecutions since 1897, when [the Court decided *Bram*]." *Id*. at 6–7. In other words, "[t]he Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will." *Id*. at 8.

*Malloy* has since been partially undermined, however. *Malloy* endorsed *Bram*'s rather strict definition of voluntariness as "'free and voluntary; that is, [the confession] must not be extracted by any sort of threats or violence, nor obtained by any direct or

implied promises, however slight, nor by the exertion of any improper influence.'" *Id*. at 7 (quoting *Bram*, 168 U.S. at 542–43).  In *Arizona v. Fulminante*, 499 U.S. 279 (1991), the Supreme Court acknowledged that, "under current precedent," "this passage from *Bram* . . . does not state the standard for determining the voluntariness of a confession." *Id*. at 285.  Instead, voluntariness is now evaluated under a more expansive standard that actually predates *Malloy*: "Is the confession the product of an essentially free and unconstrained choice by its maker?  If it is, if he has willed to confess, it may be used against him.  If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Culombe*, 367 U.S. at 602.  This inquiry requires considering "the totality of the relevant circumstances of a particular situation." *Id*. at 606.

**C.**  If any test of voluntariness applies in foreign interrogations, the Court sees no reason why a "shocks the conscience" standard should supersede the totality-of-the-circumstances test just stated.  As already noted, the applicability of the "shocks the conscience" test to foreign interrogations is of dubious origin.  More importantly, it suggests that foreign interrogators may extract statements from suspects by overbearing their will and impairing their capacity for self-determination, yet those statements may still be admissible in an American court as long as the interrogators' techniques fall short of conscience-shocking.

The "shocks the conscience" test in its original setting, *see Rochin v. California*, 342 U.S. 165, 172–74 (1952), and the voluntariness test both derive from due process. In that light, although the Court does not foreclose the possibility, the Court can find no

reason why the traditional due process voluntariness inquiry should be disregarded.

**D.**  Matters become much more complicated, however, when one considers the underpinnings of the voluntariness inquiry as elucidated in *Colorado v. Connelly*, 479 U.S. 157 (1986).  Before *Connelly*, one could have reasonably argued that the voluntariness inquiry was intended

> to bar admission of those confessions (i) which are of doubtful reliability because of the practices used to obtain them; (ii) which were obtained by offensive police practices even if reliability is not in question (for example, where there is strong corroborating evidence); or (iii) which were obtained under circumstances in which the defendant's free choice was significantly impaired, even if the police did not resort to offensive practices.

2 *Criminal Procedure* § 6.2(b).  As will become clear shortly, *Connelly* essentially narrows these three justifications solely to the second, *i.e.*, deterring offensive police practices regardless of the confession's reliability.  *See id*.

The *Connelly* case began when the defendant, allegedly prompted by the "voice of God" in his head, walked up to a Denver police officer and frankly confessed a murder.  479 U.S. at 160–61.  He repeatedly received and waived his *Miranda* rights as he assisted the police in fully corroborating his confession.  *Id*.  When the matter proceeded to prosecution, however, he moved to suppress all of his statements as "involuntary," *i.e.,* impelled by his mental illness (even though true).  *Id*. at 161.

The Colorado trial court agreed with this interpretation of voluntariness, "rul[ing] that a confession is admissible only if it is a product of the defendant's rational intellect and 'free will.'  Although the court found that the police had done nothing wrong or coercive in securing [the] confession, [the defendant's] illness destroyed his volition and

compelled him to confess." *Id*. at 162 (citation omitted). The Colorado Supreme Court agreed, holding that the Fourteenth Amendment due process clause would have been violated had the state court admitted the defendant's statements into evidence. *Id*.

The United States Supreme Court reversed, emphasizing that only a state actor can violate an individual's due process rights, and no state actor had done so under the circumstances. The Court specifically rejected the Colorado Supreme Court's "conclu[sion] that sufficient state action was present by virtue of the admission of the confession into evidence in a court of the State." *Id*. at 165. Such reasoning "fails to recognize the essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other." *Id*. at 165. "The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause." *Id*. at 166. Thus, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Id*. at 167.

Although not intentionally, *Connelly* seems to mint a coin perfectly designed for a "heads I win, tails you lose" contest in favor of admitting *any* foreign-obtained confession, so long as the United States did not participate in extracting it. One side of the coin reminds us that only a "state actor"—a government or its agent subject to the due process clause—can violate due process. The other side of the coin tells us that, for purposes of the voluntariness inquiry that flows from the due process clause, American courts admitting statements involuntarily made are not state actors.

It should go without saying that the United States Constitution does not bind any

sovereign nation other than the United States, and so no foreign country is governed by the Fifth or Fourteenth Amendment due process clauses. In that light, no foreign country is a "state actor" when extracting an involuntary confession, and no American court is a "state actor" when admitting an involuntary confession; therefore, it would seem that there is no basis under due process for excluding the confession. Yet if that is true, it raises the abhorrent possibility that statements obtained even by torture are admissible in American courts so long as the statements were extracted by a foreign government acting for its own purposes.[4]

**E.**  The Court now returns to the *Bram* decision. As mentioned, *Bram* invoked the Fifth Amendment privilege against self-incrimination as the basis for examining whether statements were made voluntarily, *see* 168 U.S. at 542, and *Malloy* later merged the standards developed under the Fifth Amendment self-incrimination clause and the Fourteenth Amendment due process clause into a single voluntariness standard, *see* 378 U.S. at 6–8. What is most interesting about *Bram* for present purposes is that the defendant was convicted based in part on statements he made to a Canadian detective who interrogated the defendant in Canada, before any United States official knew about the crime in question. *See* 168 U.S. at 537–42.

*Bram* never contemplates the possibility that the Canadian detective was not bound by the Fifth Amendment. Perhaps because the privilege against self-

---

[4] Recognizing this, two commentators have recently proposed some potential solutions. *See* Geoffrey S. Corn & Kevin Cieply, *The Admissibility of Confessions Compelled by Foreign Coercion: A Compelling Question of Values in an Era of Increasing International Criminal Cooperation*, 42 Pepp. L. Rev. 467, 487–515 (2015). Each proposal has strengths and weaknesses. The parties are encouraged to review this article.

incrimination is written in the passive voice ("nor shall [any person] be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V), *Bram* treats the privilege as something that can be evaluated entirely from a passive perspective—a privilege that is or has been violated, with no inquiry into the actor "compell[ing]" the violation.

It is questionable whether *Bram* can still be considered good law in this respect. If there is a single voluntariness standard shared by the Fifth and Fourteenth Amendments (as *Malloy* states), and if that standard requires state action (as *Connelly* states), then *Bram* should not have reached any voluntariness inquiry because the Canadian detective was not a state actor under the United States Constitution.

**F.** "Having reached the end of what seems like a long front walk," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998), the Court requires further briefing on the following questions:

- Assuming a foreign official is *not* acting at the behest of an American official, is there any existing legal basis for deeming a foreign official to be a state actor under the Fifth Amendment?[5]

- If there is no basis for deeming the foreign official to be a state actor, is there any existing legal basis for excusing the state action requirement when evaluating the voluntariness of statements made to that official?

- Is there any existing legal basis apart from the Fifth Amendment voluntariness test that would permit the Court to exclude statements

---

[5] Obviously, authorities discussing the Fourteenth Amendment may be relevant here, but the Fifth Amendment ultimately governs in federal court.

coerced by a foreign official?

- Assuming the Fifth Amendment privilege against self-incrimination applies in some way to statements made to a foreign official, on what basis would a "shocks the conscience" test supersede a traditional voluntariness test in determining whether such statements should be admitted into evidence?

**3.**

The parties are accordingly ORDERED to submit simultaneous further briefing on the foregoing questions (and any related questions that the parties deem relevant in light of the Court's questions) on or before **March 20, 2017**. The Court will establish no page limitations but trusts that the parties will address these questions with appropriate brevity and conciseness.

Dated this 8th day of February, 2017.

BY THE COURT:

_____
William J. Martinez
United States District Judge