# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Criminal Case No. 15-cr-353-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**1.    KATHERINE O'NEAL,**

      Defendant.

---

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS

---

Defendant Katherine O'Neal ("O'Neal") went to trial in February and March 2018 on one charge of unlicensed export of firearms to the Dominican Republic (18 U.S.C. § 554(a)); twelve charges of making false statements on a firearm purchase form (18 U.S.C. § 924(a)(1)(A)); and four charges of international money laundering (18 U.S.C. § 1956(a)(2)(A)). A jury found her guilty on the unlicensed export count, but acquitted on all remaining counts. O'Neal's sentencing is scheduled for August 30, 2018.

Although trial has already concluded, the Court currently has before it O'Neal's pretrial Motion to Suppress. (ECF No. 39.) This Motion seeks to suppress statements O'Neal made to Dominican Republic law enforcement officials, and statements made to an American special agent working for the Department of Homeland Security and stationed at the U.S. embassy in the Dominican Republic. O'Neal claims that her statements were not made after valid *Miranda* warnings, and otherwise not made

voluntarily.

To respond to O'Neal's arguments, the Government needed to bring in witnesses from the Dominican Republic, many of whom are the same witnesses the Government planned to call at trial. So that the Government was not forced to arrange for these witnesses to travel to Colorado twice, the Court elected to hold a suppression hearing the week before trial (the "Suppression Hearing") and to provide a brief ruling soon afterward. The Court held that hearing on February 20, 2018. (*See* ECF No. 105.) At the conclusion of the hearing, the Court orally announced that it would deny the Motion to Suppress and briefly summarized its reasoning. The Court also stated that a more detailed written order would follow. This is that written order.

The Court's oral ruling denied the Motion to Suppress in full. Upon further consideration, the Court now concludes that it should have granted the Motion as to statements O'Neal made to the Homeland Security special agent because he did not give O'Neal *Miranda* warnings. But, in light of the jury's verdict and the testimony the agent actually gave at trial, the Court finds that this error was harmless beyond a reasonable doubt. As to the remainder of the Court's oral ruling, the Court reaffirms it for the reasons stated below.

## I. BACKGROUND

O'Neal flew to the Dominican Republic on Delta Airlines on June 6, 2015, with eleven handguns and some ammunition in her luggage. She declared the handguns and ammunition to Delta. Her luggage, however, did not make it all the way to the Dominican Republic with her that day.

According to O'Neal's briefing submitted in support of the Motion to Suppress,

this luggage hiccup precipitated an extended encounter with law enforcement officials. Given its significance for purposes of assessing O'Neal's credibility when compared to her testimony at the Suppression Hearing, the Court quotes the factual averments in her related briefing at length, as follows:

### A. Statements on June 7, 2015, Outside the Santiago Airport

On June 7, 2015, Ms. O'Neal arrived at the Cibao International Airport – Santiago Airport – in Santiago, Dominican Republic. She was led to believe by either airport personnel or law enforcement there that if she came to the airport she could retrieve luggage which purportedly had not arrived with her flight.

Ms. O'Neal was not reunited with her luggage, as promised. Instead, she was immediately confronted by Dominican military law enforcement. A Dominican law enforcement officer, Major Nova-Nova,[1] met her outside the airport. He spoke with her in the outdoor driveway designated for passenger pick up for approximately 20 minutes. He confirmed her identity and elicited from her the admission that she was at the airport to pick up lost luggage which contained 11 firearms. In response to his questioning, she explained that she had brought weapons into the country to give to her family members.

The conversation was tense and turned confrontational when, at the conclusion of the conversation, Major Nova-Nova forcibly grabbed Ms. O'Neal by the arm near her elbow and pushed into the interior of the airport. Ms. O'Neal was given no choice in this matter. Major Nova-Nova directed her verbally to go inside to answer his questions.

Worse, he acted physically against her to enforce this order. Major Nova-Nova tightly held her arm near the elbow and pushed her ahead of him, forcing her into a small office area.

Not only did Major Nova-Nova physically move Ms. O'Neal in his efforts to get her to speak to him, in short order he also made sexually aggressive and suggestive comments to her which humiliated and demeaned her. During the walk from

---

[1] This turns out to be Major Jorge Novas Medrano. (*See* Part II.A, below.)

the outdoor passenger pick up area to the office, he made a derogatory comment that O'Neal's butt would look nice in a pair of jeans. Ms. O'Neal was shocked and angered by this. She was fearful. In reply, she called the Major a "son of a bitch."

## B.      Statements on June 7, 2015, in the Office at the Santiago Airport

The harassment and unwanted physical and sexual contact continued in the office. Major Nova-Nova led Ms. O'Neal into a small office in the baggage claim area of the airport where he questioned her further (she believes this was for a short time – less than 1 hour).

The room was small with only a table as furniture. There was nowhere for her to go; no way to escape the sexual touching. Upon their entry into room, Major Nova-Nova slid his hand from Ms. O'Neal's elbow, down her lower back, and onto her buttocks. He grabbed her on the buttocks. It was in this hostile and intimidating milieu that he further questioned her about the guns in her luggage.

Eventually, Major Nova-Nova locked her in the room. This happened when he left the room for approximately 5–10 minutes and Ms. O'Neal tried to the open the door but realized it was locked.

Facing this barrage of unwelcome advances and now locked in a room by her tormentor, she began to feel dizzy and light headed. Critically, Ms. O'Neal, a rape survivor, also experienced flash-backs to her prior sexual assault. Believing that she was on the verge of being sexually assaulted, Ms. O'Neal sought medical attention when Major Nova-Nova returned. She was removed from the room by a nurse and briefly taken to a medical clinic located inside the airport.

## C.      Transport from Santiago to Sant[o] Domingo

Unfortunately, the ordeal was nowhere near over. After questioning Ms. O'Neal in the small office at the airport, Major Nova-Nova, accompanied by two additional Dominican officers unknown to Ms. O'Neal, transported her to the J-2 Office in Santo Domingo, an approximately 2 hour drive.

Strangely, but contributing to her sense of helplessness, Ms.

O'Neal was driven in her personal vehicle by these officials. She verbally protested this highly unusual arrangement, but to no avail. Fearful of Major Nova-Nova, she refused to sit in the front passenger seat.

On the way there, Ms. O'Neal became concerned about the manner that the officer was driving her car. She demanded that Major Nova-Nova slow down.

Conversely, he sped up and drove the vehicle recklessly, way too fast for traffic conditions and slamming on the brakes at least once, nearly hitting another vehicle. All the while, he kept up his sexual advances, at one point commenting to her about how she would look wearing tight jeans instead of her uniform.

## D.    June 7, 2015, First Interview

Upon arrival at the J-2 Office, Ms. O'Neal was handed off to two J-2 officers.

She was not free to leave and, in fact, was again forcibly escorted as the officers held on to each of arms near the elbow and pushed her into the building and into an office she believes was located on the second floor.

During this escort, law enforcement continued to act inappropriately. While escorting her, the officers joked about which of her 11 firearms they were going to keep for themselves.

Eventually, they placed Ms. O'Neal in a very small windowless office containing only a desk and file cabinet. Two Dominican law enforcement officials began to interrogate her in that office. During this interrogation, officers told Ms. O'Neal that she was going to be asked questions which she was *required* to answer. They coerced answers from her by threatening her family with violence. Specifically, they told her that, if she did not answer the questions the way that they told her to, the officers would "hurt" her cousin Jose Luis (the cousin who had accompanied her to the airport earlier that day). The officers repeatedly threatened to beat and rape Jose Luis if Ms. O'Neal did not cooperate with them.

As the interrogation continued, the officers were physically aggressive with her. They pushed her around the small office.

Finally, at no time did they attend to her physical needs. By this time, at least three hours had passed since Ms. O'Neal had last eaten or drank any water. Although she requested a glass of water, the officers refused to provide any. Instead, they took her to an interview room for further questioning.

## E.    June 7, 2015, Second Interview

Three Dominican officials escorted Ms. O'Neal from the windowless little office to an interview room next door where they interviewed her for 3 hours. This second interview room, like the first, had no windows and contained only a small table and chairs. Ms. O'Neal sat on one side of the table with an officer sitting directly next to her. Another officer held a video camera placed on a tripod. Ms. O'Neal was given a piece of paper which contained both a series of questions and answers. Prior to beginning the interrogation, Ms. O'Neal was again threatened – if she did not cooperate they would "hurt" her cousin.

Still being filmed, and by now petrified, Ms. O'Neal began reading the answers off of the paper. Anytime, she hesitated in responding, she was told that the camera would be turned off and that they would start again.

Significantly, the sexual harassment resumed during this interview. Throughout, this question and answer, the officer seated next to her was patting and rubbing her knee.

At the conclusion of this interview, Ms. O'Neal was returned to the small office. She remained there all night, as detailed below.

## F.    Spending the Night in the J-2 Office

Nervous and extremely fearful for her physical well-being, Ms. O'Neal requested a female officer accompany her. A female officer arrived some time later and Ms. O'Neal was locked in that office with the female officer overnight.

Ms. O'Neal slept on the hard office floor with no bedding. She was given neither food nor water. Because she was not allowed to use a bathroom she urinated on herself at some point during the night. At most, Ms. O'Neal slept an hour.

At one point, Ms. O'Neal noticed that the female officer was taking pictures of her with a cell phone while smiling and

laughing.

### G.    June 8, 2015, Interview

The next morning, a hungry, soiled and sleep-deprived Ms. O'Neal was escorted to an open area outside of the small office where she spent the night.  She was seated at a table where she was questioned by 5 unknown law enforcement officers.  Reports indicate that a US HSI official, Larko, was present during this interrogation along with Dominican Transnational Criminal Investigation Unit officers Castillo and Morales.

Ms. O'Neal was not Mirandized prior to this interview.  She was again asked a series of questions about the firearms and other related topics.  At this point, Ms. O'Neal had not eaten or drank any water in nearly 24 hours.  She had not been given the opportunity to use a bathroom – although she had urinated on herself at least twice.

She had only had about 1 hour of sleep on the floor of the small office.

After this interrogation, Ms. O'Neal was transported, again in her personal vehicle, back to Santiago and detained in the local women's prison where eventually, she would suffer repeated assaults.

(ECF No. 51 at 4–9 (emphasis added).)

## II. SUPPRESSION HEARING TESTIMONY

### A.    Novas Medrano

The first witness at the Suppression Hearing was Major Jorge Novas Medrano ("Novas") of the Dominican Republic Army.  Novas testified as follows.

As of June 2015, Novas was an inspector in the Dominican Republic Army's J-2 unit, which is responsible for intelligence.  Novas supervised J-2 operations in a certain geographic area encompassing Cibao International Airport.

On the morning of June 7, 2015, Novas received word that firearms had been

discovered in unattended luggage at the airport.[2]  The luggage had been identified as belonging to O'Neal.  Novas traveled to the airport and, along with his officers there, began a lookout for O'Neal, who was expected to return to claim her bags because Delta had already contacted her to tell her that her bags had arrived.

At about 5:30 PM, a woman matching O'Neal's description, and also wearing camouflage fatigues, arrived at the airport.  Novas found the fatigues significant because the unclaimed luggage included at least one large green bag similar to those associated with traveling servicemembers.

Novas approached O'Neal and, speaking Spanish, identified himself and his position.  O'Neal, also speaking Spanish, identified herself as a captain in the U.S. Navy and stated that she was there to claim her luggage, showing Novas her baggage claim ticket and lost luggage paperwork.  Novas asked about the firearms discovered in her luggage, and O'Neal showed him a "voucher" as "proof of purchase of the weapons" in the United States.

According to Novas, this interaction, which lasted about five minutes, took place in the airport's open-air passenger arrival and drop-off area.  Novas asked O'Neal to accompany him to a customs office inside the airport where there were eight or ten other government employees working.  Novas denied O'Neal's allegation that he forcefully guided O'Neal to the office inside the airport by grabbing her elbow.  He said that, instead, he and one of his officers walked on either side of O'Neal, while his other officer walked behind her.

---

[2] Apparently Delta Airlines had sent O'Neal's luggage on a later flight, the luggage had been offloaded and sent to the baggage claim carousel, and it was never picked up—because O'Neal had long since left the airport.

While in the office, O'Neal sat in a chair and Novas remained standing while he read a *Miranda*-like warning required under Dominican Republic law. O'Neal responded that she understood her rights. Novas announced that O'Neal was under arrest "for purposes of an investigation" regarding violation of the Dominican Republic's laws against weapons trafficking. O'Neal then volunteered that she was a firearms collector and she was accustomed to traveling with her weapons.

Novas denied having touched O'Neal inappropriately or having made sexually suggestive remarks in the office or at any time during the day. He further denied O'Neal's account that she had called him a son of a bitch.

About five minutes into the office interview, O'Neal began to feel faint. Novas ordered two women from the office to take O'Neal to the airport infirmary. O'Neal returned about ten minutes later feeling better. Novas and O'Neal continued to "chat" about her military service and her habit of traveling with guns because she was a collector.

At some point, Novas's superiors ordered him to bring O'Neal from the airport to J-2 headquarters in the country's capital city, Santo Domingo. Novas proceeded with one of his subordinates, with an airport official, and with O'Neal to the airport parking lot where they found O'Neal's vehicle. There they encountered two men who had accompanied O'Neal to the airport, a police sergeant (not under Novas's command) and a physical education teacher. Novas arrested them for investigatory purposes. Novas then drove all six of them (himself, his subordinate, the airport official, O'Neal, and her two companions) to Santo Domingo, using O'Neal's vehicle, a Chevrolet Avalanche. He used O'Neal's vehicle because he had no government-assigned vehicle nor, at that

time, a personal vehicle. The drive to Santo Domingo took approximately two hours. O'Neal was in the back seat. Novas denied O'Neal's allegations that he threatened her or made sexually suggestive remarks during the course of the drive.

Novas delivered O'Neal to J-2 authorities as required that evening, and had no further interaction with her.

## B. Pedro Knight Rymer

The second witness was Colonel Pedro Knight Rymer ("Knight"). In June 2015, Knight was a senior official at J-2 headquarters in Santo Domingo. He testified that he was not in the office when O'Neal arrived on June 7, 2015, because that happened late in the evening. He returned to headquarters the next morning, June 8. He and another J-2 officer interviewed O'Neal first thing that morning, beginning sometime between 8:00 and 9:00 a.m. The interview took place in an office with one door, a window, a desk, and chairs. Knight and his colleague sat next to each other at the desk, and O'Neal sat at the desk across from them. At the outset of the interview, O'Neal appeared "calm" and "normal," and there was no sign that she had urinated on herself during the night.

Knight asked about the weapons found in O'Neal's luggage, and O'Neal responded that she brought guns into the country because she was intending to retire to the Dominican Republic at the end of her Army service, and she intended to establish a business with them, but did not say what kind of business. She further volunteered that she was a firearms expert and had been involved in shooting competitions. She also described a trip she had made to the Dominican Republic six months earlier (December 2014) during which she had brought guns from the United States and then returned with them to the United States.

Knight denied that he or his colleague threatened or touched O'Neal in any way. It was J-2 policy to interview suspects in pairs, as Knight did in this instance, to prevent such unlawful or untoward behavior from happening.

Knight's interview with O'Neal lasted somewhere between 60 and 90 minutes. Following the interview, he permitted another Dominican Republic law enforcement official from a different agency, Pedro Castillo, to interview O'Neal (Part II.C, below). And, later that day, he was present when a U.S. official, Matthew Larko, interviewed O'Neal (Part II.D, below).

## C.    Pedro Castillo Nolasco

The third witness was Pedro Castillo Nolasco ("Castillo"), an officer in the Dominican Republic's national police force. He testified that in June 2015 he was assigned to an international organized crime detail that went by the acronym "TCIU." On the night of O'Neal's arrest (June 7), Castillo's superior ordered Castillo to go to J-2 headquarters and interview O'Neal the following morning (June 8). Castillo did so, along with another officer from his same detail. At J-2, they met Knight who led them to the office where O'Neal was sitting. Knight then left Castillo and his partner alone with O'Neal.

Castillo announced his position and asked O'Neal to explain where the firearms came from and why she had brought them to the Dominican Republic. She responded that she was planning to "retire" in the Dominican Republic and that she wanted to have her guns so she could protect herself. She stated that she bought the guns in Colorado. She further stated that she did not contact any Dominican Republic authorities about the lawfulness of bringing guns into the Dominican Republic because "she had made a call to the airline and . . . had filled out a form." At some point, she also spoke about her

December 2014 trip where she had brought firearms into the Dominican Republic and then left with them. She elaborated that "she was thinking of retiring because she was tired of working" and had brought weapons at that time "for her own protection," but "she had been called back up by the Army and assigned a new mission and so she had to come back to the United States" and brought those guns back with her. She also described herself as a target shooting enthusiast and that she had represented the U.S. Army in shooting competitions.

Castillo denied O'Neal's allegations that he had threatened her or her family, that he had touched her in any way, or that he had required her to answer questions in a certain way. Castillo described her demeanor throughout the interview as "pretty close to normal" although "occasionally . . . she would shed a few tears." The interview ended after approximately thirty minutes.

**D.  Matthew Larko**

The fourth witness was Special Agent Matthew Larko ("Larko") of the United States Department of Homeland Security. Larko testified that he was stationed in the U.S. embassy in Santo Domingo in June 2015. He interacted with the TCIU which, he explained, is short for "transnational criminal investigative unit." It comprised a number of Dominican Republic military and law enforcement officials who are vetted so they can assist Homeland Security with its investigations in the Dominican Republic. TCIU would also sometimes investigate matters of greater interest to the Dominican Republic than to the United States.

Sometime on June 7 or 8, 2015, Larko received a request from Dominican Republic law enforcement to assist them in their investigation of a U.S. citizen who had been detained for bringing firearms into the country. Larko came to J-2 headquarters

on June 8 and was led to an open office area with multiple desks where he encountered O'Neal sitting at the side of one of the desks. Larko sat down (as he described it) "catty-corner" to O'Neal at the same desk.

Larko and O'Neal conversed in English. Larko did not provide a *Miranda* warning because he understood himself to be assisting the Dominican Republic in its investigation and potential prosecution, and saw no nexus to a United States prosecution at the time. By contrast, when his own office directs him to interview a suspect, he assumes that a United States prosecution is possible, and so he provides a *Miranda* warning.

Larko asked O'Neal whether she had received permission to travel with firearms. She responded that she spoke with Delta Airlines and filled out Delta's required paperwork, and that Delta "said there was nothing more that she needed to do." Larko also asked about any previous trips in which O'Neal had brought guns to the Dominican Republic, and he received the same story as Knight and Castillo regarding O'Neal's December 2014 trip where she entered with firearms but then brought them back to the United States.

Larko denied ever having touched or threatened O'Neal, or having made sexually suggestive remarks. He saw no evidence that she had been mistreated, or that she had urinated on herself at any time. Throughout the interview, he perceived O'Neal's demeanor as relatively casual. She was "upset at the situation," but not in a way "that stood out to [Larko] that would warrant attention."

**E.    O'Neal**

O'Neal testified on her own behalf as the final witness at the hearing. Her version of events is as follows.

O'Neal arrived in the Dominican Republic on Delta Airlines on June 6, 2015, but her luggage did not arrive with her.  She filled out a form provided to her by a Delta representative and the representative said that someone would contact her when her luggage arrived.  However, O'Neal herself called the next afternoon (June 7) and learned that her luggage had arrived and that she could come pick it up.  The Delta representative told her to return to the airport in uniform, which O'Neal thought "was odd."  O'Neal put on her uniform, and then she drove with her cousin and a friend to the airport—roughly a two-hour drive from where she was staying.  Her cousin and friend came along because traveling alone in the Dominican Republic is not safe.

At the airport, she encountered Novas, who approached her and asked if she was Katherine O'Neal.  She responded affirmatively.  Novas then asked for O'Neal's ID card.  O'Neal removed her ID card from her pocket and held it out toward Novas, who reached out as if to take the ID card, but in the process he also placed his thumb on O'Neal's thumb.  O'Neal then drew back her hand, leaving the ID card in Novas's hand, and Novas said something to a nearby colleague that gave O'Neal the impression that they found the incident funny.

Novas ordered O'Neal to accompany him inside the airport.  He guided O'Neal into the airport with his hand on her elbow, pushing her forward if needed.  At one point, O'Neal "kind of like pulled away" and Novas said something to the effect of wondering how O'Neal would look wearing jeans instead of her uniform.  O'Neal called Novas the Spanish equivalent of "son of a B" (*i.e.*, she truncated the Spanish equivalent of "bitch" to its first letter), prompting Novas to push her by the back through the airport.

Soon they arrived at a "very small office" with no one else inside.  On direct

examination, O'Neal stated that Novas did not touch her at all while in that office.  On cross-examination, O'Neal testified that Novas's hand was still on her lower back as they arrived at the office and at that point O'Neal moved away from him.  As she moved away, Novas's hand slid "heavily" down toward her buttocks.

O'Neal, Novas, and Novas's subordinates remained standing while in this room.  She was not locked in the office, and was never alone there.  At some point, Novas asked O'Neal about the men who had accompanied her to the airport, and that is when O'Neal began to feel faint because she was worried about what the government officials might do to her companions.  O'Neal lost consciousness and woke up in the airport infirmary.  After being attended to for a few minutes by the infirmary staff, she was escorted back to the room where she had been previously.  At that point, Novas told her that he must take her to Santo Domingo.  Novas brought O'Neal to her truck and then began the drive, with himself and a subordinate in the front seat.  O'Neal, her two companions, and the other subordinate were in the back seat.

The drive from Santiago to Santo Domingo normally takes two hours and fifteen minutes, but it only took ninety minutes in this instance because Novas drove recklessly.  At some point, Novas turned around and commented on O'Neal's hairstyle and that it would "go well" with "tight jeans."

Eventually they all arrived at J-2 headquarters in Santo Domingo and O'Neal was escorted to a second-floor office.  Her memory of precisely who interviewed her and when the interviews took place is disjointed.

If events happened in the sequence she remembers, she was first interviewed by Larko, Castillo, and three others, who spoke with her relatively informally and asked her

general questions about the firearms.  O'Neal then spent the night in a small J-2 office, supervised by a female official.  O'Neal was not given anything to eat or drink.  She ended up urinating on herself because she was afraid to ask to use the bathroom.  She had previously asked for water and the female official refused, so O'Neal "assumed" from that point forward that she "couldn't ask for anything."  O'Neal did not sleep that night.

The next morning she was taken to a small interview room where Castillo and another police officer interviewed her.  Castillo handed her a pre-written list of questions and answers and ordered her to respond to him according to the script.  When O'Neal refused, Castillo threatened to hurt her cousin.  O'Neal then relented and recited what she was prompted to recite, while being recorded by a video camera.

Following this, she was taken to an area outside the interview room where Knight and Larko asked her questions.  She answered Larko's questions respectfully because she was afraid of what law enforcement might do to her otherwise.

On cross-examination, O'Neal was asked about her accusation in briefing that one of the interrogators had touched her knee during this interview.  She was asked if Larko was the one that touched her.  She responded that it was actually "[t]he gentleman that was next to him."  She was then confronted with the oddity of someone reaching across Larko's body to touch her knee, and she answered that the other person was actually next to her, not Larko.

O'Neal denies having ever said to Larko or Knight that she brought guns into the Dominican Republic and then back to the United States in December 2014.  That was something that Castillo required her to say as part of his interrogation.

### III. *MIRANDA* ANALYSIS

**A.     Statements to Dominican Republic Officials**

O'Neal claims that she received no *Miranda* warnings during any of her interrogations, including those conducted by Dominican Republic officials.  There is some evidence that Novas read a *Miranda*-like warning to O'Neal, but all of the other Dominican Republic officials testified that they did not give O'Neal any similar warning because Dominican Republic law only requires the warning to be given once.

Regardless, "[t]he cases are unanimous in holding that a [*Miranda*] warning is not essential to the validity of a confession which has been given [to foreign officials] in a foreign country."  *United States v. Mundt*, 508 F.2d 904, 906 (10th Cir. 1974).  O'Neal points to the holdings of some courts that *Miranda* warnings are required if an investigation is a "joint venture" between United States officials and foreign officials, *see United States v. Frank*, 599 F.3d 1221 (11th Cir. 2010); *United States v. Heller*, 625 F.2d 594, 599 (5th Cir. 1980), but the Tenth Circuit has rejected the "joint venture" theory because "joint venture" "is a vague, indefinite term and is . . . unreliable." *Mundt*, 508 F.2d at 907.  The question, rather, is whether foreign officials are "acting as agents for the United States" during the interrogation itself.  *Id.*  If foreign officials are more than "mere instruments of United States officials," the lack of a *Miranda* warning is not a bar to admission of a defendant's statements.  *Id.*

From the evidence introduced at the Suppression Hearing, it is clear that Dominican Republic officials were investigating O'Neal for violation of local laws regarding firearms importation and trafficking.  Furthermore, from the parties' pretrial filings it is clear that the Dominican Republic officials have kept possession of the firearms and ammunition because they intend to prosecute O'Neal as well.  (*See* ECF

No. 88 at 1–2.)  When foreign officials institute their own prosecution, it is evidence that they are not "mere instruments of United States officials."  *Mundt*, 508 F.2d at 907.  The Court finds that a *bona fide* intent to prosecute similarly shows as much.  Accordingly, no Dominican Republic interrogator acted as an instrument or agent of a United States official.  O'Neal's statements to these interrogators therefore need not be excluded solely for lack of a *Miranda* warning.

## B.    Statements to Agent Larko

Larko presents a different question.  He was indisputably an American law enforcement official and he did not provide a *Miranda* warning.  Larko says he skipped the *Miranda* stage because he believed his purpose was to assist Dominican Republic authorities, not to develop evidence for a possible United States prosecution.  But there is "nothing in the *Miranda* opinion which calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody."  *Mathis v. United States*, 391 U.S. 1, 4–5 (1968).  Moreover, the Court is persuaded by the Second Circuit's holding that American officials interrogating suspects in foreign custody must provide *Miranda* warnings if they want to introduce the suspect's incriminating statements in a United States prosecution.  *See In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 198, 203 (2d Cir. 2008).  O'Neal's statements to Larko are therefore inadmissible and her Motion to Suppress is granted to this extent.

## IV.  *MIRANDA* & HARMLESS ERROR

As noted, the Court's pretrial oral ruling did *not* order suppression of O'Neal's statement to Larko.  And Larko in fact testified at trial in a manner substantially similar to his Suppression Hearing testimony.

The Court should not have allowed Larko's testimony at trial regarding the statements O'Neal made to him. Nonetheless, admitting "un-Mirandized" statements obtained through a custodial interrogation may be harmless error. *Neder v. United States*, 527 U.S. 1, 18 (1999). When a constitutional error is in question, the error is harmless if the Court is convinced "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967). Stated slightly differently, the Court must ask, "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" *Neder*, 527 U.S. at 18. The answer in these circumstances is "yes." Thus, the Court would deny any motion seeking a new trial, such as under Federal Rule of Criminal Procedure 33.

Understanding why the Court's admission of Larko's testimony regarding O'Neal's statements was harmless requires keeping in mind that the jury acquitted O'Neal on all but Count 1 of the indictment, which charged unlicensed export of firearms. The jury received the following instruction on that count:

> Count 1 of the Second Superseding Indictment charges a violation of Title 18, United States Code, Section 554, which makes it a crime for anyone to knowingly or fraudulently export, or attempt to export, any article from the United States contrary to any law or regulation of the United States.
>
> For you to find the Defendant guilty of this crime, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:
>
> *First*, that the Defendant knowingly or fraudulently exported, or attempted to export, an article described in the indictment—in this case, firearms;
>
> *Second*, that the Defendant's exportation was contrary to a United States statute—in this case, the Arms Export Control Act, 22 U.S.C. § 2778, and regulations promulgated

thereunder; and

*Third*, that the Defendant knew that exporting firearms was contrary to law or regulation.

* * *

The Government need not prove that the Defendant knew the exportation or sending was contrary to any specific statute or specific regulation or that any license was required. It is enough if the Government proves that the Defendant generally understood that her actions were unlawful.

(ECF No. 131 at 17–18.)

The evidence as to the first element was essentially undisputed and otherwise overwhelming. O'Neal's attorneys' cross-examinations of the various witnesses never attempted to call into question whether O'Neal knew she was bringing eleven firearms and ammunition from the United States to a foreign country. Furthermore, there was no evidence from which a reasonable jury could have inferred that she did not know she had packed firearms and ammunition into her luggage, or that she did not know she was headed to a foreign country.

The second element was established as a matter of law. There has never been a question in this case that the Arms Export Control Act and its regulations prohibit exportation without a license of the firearms and ammunition found in O'Neal's luggage.

The only element in question was the third: whether O'Neal knew that it was illegal to export firearms. As to that, Larko's trial testimony included only one statement from O'Neal with arguable relevance to this element, namely, that she spoke with her sergeant, whose last name was Lane, about taking guns to the Dominican Republic, and Lane told her that all she needed to do was have a concealed-carry permit and

declare the firearms to the airline.  (Day 3 Tr., afternoon session.)[3]  This statement must

be understood in the context of Lane's own testimony, immediately before Larko took

the stand, that he never provided any such advice to O'Neal, nor would he have

provided such advice because he knew that the process for taking guns outside the

United States was more complicated.  (*Id.*)

After comparing Lane's and Larko's testimony on this subject, a jury could infer

that O'Neal lied to Larko about her efforts to understand the process for taking firearms

outside the United States.  But any inference specifically as to element three of the

illegal export count is more attenuated.  A jury might infer that O'Neal's lie to Larko also

suggested a guilty conscience, or in other words, that she knew she could not legally

take the firearms outside the United States so she made up a story that she hoped

would suggest an innocent mistake.  But a jury could reach essentially the same

inference without assuming that she understood the unlawfulness of exporting firearms.

That is, a jury could conclude that she fabricated a story on the spot to suggest innocent

mistake *without also concluding* that she knew at the time of her travel to the Dominican

Republic that the law forbade her actions.

In any event, whatever inference the jury drew from comparing Lane's and

Larko's testimony, it was insignificant compared to what the jury learned from other

Government witnesses.  The Government presented Matthew Howie, Ian Wilbur, and

David Fletcher, all of whom were United States Customs and Border Protection agents

working at the Port Huron, Michigan, border crossing in June 2005.  That month, O'Neal

---

[3] Official transcripts from O'Neal's trial are not yet available.  The Court will therefore cite
the unofficial, rough transcripts generated by the court reporter and made available for internal
Court purposes.  All references to Larko's trial testimony are from the Day 3 transcript,
afternoon session.

crossed into Ontario at Port Huron and was immediately turned around by Canadian border agents and sent back into the United States because she had a firearm in her car. All three agents remembered this incident—albeit at times refreshed by the official report they contemporaneously generated—because immediate turnarounds are rare, particularly turnarounds due to firearms. Two of the agents, Wilbur and Fletcher, spoke with O'Neal and told her that certain ATF forms are required to leave the United States with a firearm, and, in any event, Canada does not permit individuals to enter with their firearms. They also testified about large roadside signs informing drivers as much as they approach the Port Huron crossing. O'Neal's counsel did not cross-examine any of these witnesses. (Day 5 Tr., morning session.)

Based on the foregoing testimony, the Court is convinced beyond a reasonable doubt that Larko's testimony concerning O'Neal's purported interaction with Lane had no effect on the jury's decision to find element three satisfied. Stated differently, the Court is convinced beyond a reasonable doubt that the guilty-conscience inference a jury might have extrapolated from Larko's testimony was in no way a "tipping point," without which a jury might have harbored serious doubts about O'Neal's knowledge. Rather, the testimony of the Port Huron border agents, standing alone, would still have led the jury to convict. Admitting Larko's statement about O'Neal's purported conversation with Lane was, accordingly, harmless.

The remainder of Larko's trial testimony regarding O'Neal's statements to him had no bearing on element three of the illegal export count. For thoroughness, however, the Court will briefly address each statement individually:

*That she traveled to the Dominican Republic from Denver, via New York City.*

22

This was undisputed throughout the trial.

*That she traveled in military fatigues because she had gone immediately from being on duty to the airport.* There was testimony from O'Neal's company commander, Capt. Friend Solberg, that he remembered O'Neal wearing civilian clothes when she signed out to begin her leave. (Day 2 Tr., morning session.) Assuming the jury credited this testimony, it could make any number of inferences about O'Neal wearing civilian clothing when signing out but then changing into military fatigues before heading to the airport. But these inferences would have little or nothing to do with the third element of the illegal export count.

*That she had traveled to the Dominican Republic in December 2014 with five firearms, but she brought all of them back to the United States. Also, her reason for bringing firearms in December 2014 was her plans on retiring and building a house, and she was going to give the guns to her family members to secure the area during construction.* The Government never charged O'Neal with an illegal export count based on any actions in December 2014. This testimony from Larko was, instead, part of the Government's case to show a pattern of money laundering related to alleged previous instances of gun-running. But the jury acquitted O'Neal on the money laundering charges, so this testimony turned out to be meaningless. Moreover, two Dominican Republic officials—Knight and Castillo—testified at trial that O'Neal made substantially similar statements to them. (Day 3 Tr., morning & afternoon sessions.) So this evidence came in through other, admissible, sources as well.

*That her purpose of bringing the eleven firearms on this trip was to give them to her uncle, supposedly to secure the construction site of her house.* The only possible

relevance is an inference that such a story is implausible and therefore suggests a guilty conscience regarding *something*. It has no direct, or even reasonably indirect, relevance to the third element of the illegal export count.

*That she purchased the eleven firearms currently at issue from Neves Uniforms and the "Colorado gun exchange"; that she paid between $400 and $500 per firearm; and that she had closed out her TSP account to fund part of the purchase.* This evidence was generally in support of the Government's charges of money laundering and making false statements on an ATF form. But the jury acquitted on those charges. Also, the substance of these statements came in through other trial witnesses, namely, Paula Wendt (Day 1 Tr., afternoon session; Day 2 Tr., morning session), Britt Yamada (Day 2 Tr., morning session), and Cynthia Glaser (Day 5 Tr., afternoon session).

*That she earned about $5000 per month, and was living paycheck to paycheck.* This is irrelevant for the same reasons just stated, but in any event, this information also came in through the testimony of Cynthia Glaser. (Day 5 Tr., morning & afternoon sessions.)

For all these reasons, the Court finds that its admission of Larko's testimony regarding O'Neal's un-Mirandized statements while in custody was harmless.

## V. VOLUNTARINESS ANALYSIS

### A. Legal Standard

Even where *Miranda* does not apply, any statements extracted from a defendant must still have been made "voluntarily." *See, e.g.*, *Beckwith v. United States*, 425 U.S. 341, 348 (1976) (statements resulting from noncustodial questioning can still be challenged on voluntariness grounds); *Lego v. Twomey*, 404 U.S. 477, 487–88 (1972) (treating the voluntariness of a confession as a separate issue from *Miranda* warnings).

In briefing leading up to the Suppression Hearing, the parties discussed at length the proper standard for evaluating the admissibility of confessions extracted by foreign officials, with a particular debate between voluntariness and a "shocks the conscience" standard. The Court called for further briefing, expressing concern that Supreme Court case law seems to strip away all barriers to foreign-obtained confessions, even if obtained through torture. (ECF No. 57.) The Government's supplemental brief offered a "concession—solely for this case" that the Fifth Amendment voluntariness standard should apply to the statements extracted by Dominican Republic officials: "The Court should exclude any statements made to Dominican officials that it finds were involuntary, as it would involuntary statements procured by U.S. officials." (ECF No. 62 at 1–2.) The Court accepts the concession and therefore moves ahead with the voluntariness inquiry as if the Dominican Republic officials were American officials.

Voluntariness is judged under an expansive standard: "Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). This inquiry requires considering "the totality of the relevant circumstances of a particular situation." *Id.* at 606. With respect to a defendant's statements, "[t]he burden of proof is on the government to prove the statements were voluntary." *United States v. Muniz*, 1 F.3d 1018, 1021 (10th Cir. 1993).[4]

---

[4] "By contrast, when a defendant makes a motion to exclude coerced testimony of a third party on due process grounds, the burden of proving improper coercion is upon the defendant." *United States v. Dowell*, 430 F.3d 1100, 1107 (10th Cir. 2005) (internal quotation marks omitted). No such third-party testimony is at issue here.

Some factors that courts have found salient in the voluntariness analysis are as follows:

- actual violence against the suspect;

- credible threats of violence against the suspect, or against the suspect's family members, loved ones, or friends;

- other threats, such as economic or reputational threats;

- deprivation of food, water, medicine, sleep, clothing, or protection from the elements;

- the length of the interrogation(s), and the length of confinement generally;

- being moved from place to place and being questioned by different persons, thus causing disorientation;

- being held incommunicado;

- broken promises, such as specific promises of nonprosecution;

- police trickery or deception;

- appeals to religious beliefs;

- age, sex, and race (often in comparison to the interrogators);

- mental impairment (both permanent, such as a learning disability, and transient, such as being drunk or high); and

- prior experience with the police.

2 Wayne R. LaFave *et al.*, *Criminal Procedure* § 6.2(c) (4th ed., Dec. 2017 update).

**B.    Application**

1.    <u>Likely Irrelevance</u>

Given the outcome of the trial—the jury's acquittal on all but the illegal export

count—the voluntariness inquiry is likely irrelevant for essentially the same reasons discussed above regarding *Miranda* and harmless error (Part IV).  The Court could have excluded all of the Dominican Republic witnesses and the evidence still would have been enough to find beyond a reasonable doubt that O'Neal knew she was acting illegally (the only element in dispute).  However, for thoroughness, the Court proceeds below to analyze voluntariness.

2. <u>Credibility</u>

The Court understood going into the Suppression Hearing that its voluntariness conclusion would likely turn on witness credibility.  The Court therefore listened to and observed each witness very closely, with credibility specifically in mind.

The demeanor, body language, and matter-of-fact forthrightness of Larko and Castillo led the Court to conclude that those two witnesses were highly credible.[5] Novas and Castillo were more standoffish, as if it was beneath them to be required to justify their actions in court.  It was therefore more difficult to assess their credibility.  But O'Neal was least credible of all, primarily due to inconsistencies and absurdities, including the following:

- At the Suppression Hearing, O'Neal claimed that a Delta representative told her to wear her Army uniform when coming to retrieve her luggage, which the Court has difficulty believing.

- In pretrial briefing, O'Neal claimed that Novas's hand slid down her back toward her buttocks and that he also grabbed her buttocks while in the

---

[5] Although Larko's testimony should have been excluded at trial, this does not prevent the Court from evaluating his Suppression Hearing testimony from the standpoint of credibility, as compared to O'Neal and other witnesses.

airport interior office.[6]  At the Suppression Hearing, she revised this to say only that his hand slid heavily down her back toward her buttocks.

- In pretrial briefing, O'Neal claimed that Novas locked her in the airport interior office and left her alone there for 5–10 minutes.  At the Suppression Hearing, she testified that she was not locked in or left alone in that room.

- In pretrial briefing, O'Neal claimed she lost consciousness at the airport out of fear of an impending sexual assault.  At the Suppression Hearing, she testified she lost consciousness because she began worrying about what law enforcement officials would do to her traveling companions.

- In pretrial briefing, O'Neal claimed she was not allowed to use the restroom during her overnight stay in the J-2 office.  At the Suppression Hearing, she admitted that she never asked to use the restroom.

- At the Suppression Hearing, O'Neal testified that an interrogator sitting on the other side of Larko touched her on her knee, but she retracted that statement and relocated this interrogator to her other side when it became clear that it would be rather absurd for someone to intimidate her by reaching across Larko's body.

Given all this, and in light of the Court's finding that Larko and Knight were both highly credible, the Court is forced to conclude that O'Neal fabricated or exaggerated

---

[6] There was discussion at the Suppression Hearing about whether the Court can fairly compare O'Neal's account in pretrial briefing to her account on the stand.  O'Neal's counsel specifically argued that they worked from incomplete information when preparing pretrial briefing.  But the Court continues to believe, as it expressed at the hearing, that it can rely at least on factual assertions that O'Neal's counsel could only have learned from O'Neal herself.

her alleged mistreatment while in Dominican Republic custody on June 7–8, 2015. Thus, the Government has carried its burden to demonstrate that O'Neal's statements were made voluntarily.

## VI.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    O'Neal's Motion to Suppress (ECF No. 39) is GRANTED IN PART and DENIED IN PART for the reasons stated above; and

2.    The Court FINDS that admission of Special Agent Matthew Larko's testimony at trial regarding O'Neal's statements to him while in custody was harmless error.

Dated this 27th day of June, 2018.

BY THE COURT:

William J. Martinez
United States District Judge